UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 25-CR-305 (APM) |
| | : | |
| FREDRICK CRAWFORD, | : | |
| | : | |
| Defendant. | : | |

OPPOSITION BY THE UNITED STATES TO
DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Defendant Fredrick Crawford's Motion to Revoke the Magistrate's Detention Order [ECF No. 11] (hereafter, the "Defendant's motion") in this matter. As Magistrate Judge Faruqui determined, and for the reasons detailed below, there is clear and convincing evidence that no conditions, or combinations thereof, will reasonably assure the community's safety, should the Defendant be released.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

A. *Procedural History*

On September 30, 2025, a federal grand jury returned a six-count indictment [ECF No. 1] charging the Defendant with two counts of Distribution of a Detectable Amount of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and four counts of Distribution of Forty Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).[1] On October 1, 2025, the Defendant was arrested. The Defendant had his initial appearance before

---

[1] Contrary to the assertion in the Defendant's Motion, he is not currently charged with Distribution of 400 Grams or More of Fentanyl. *See* ECF No. 11, pg. 1.

United States Magistrate Judge Zia M. Faruqui that same day, where he was also arraigned on the September 30, 2025 Indictment. A detention hearing was scheduled for October 3, 2025.

On October 3, 2025, following argument from the parties and testimony from three of the Defendant's family members, Judge Faruqui continued the detention hearing to October 7, 2025, in part to give the Defendant additional opportunity to provide information about a proposed release plan. On October 6, 2025, the Defendant filed his Response to the Court's Request for Release Plan [ECF No. 8], including his proposed conditions, a schedule for third-party monitoring, and several letters of support. On October 7, 2025, at the continued detention hearing, and following additional argument from the parties, Judge Faruqui ordered the Defendant held without bond, concluding that the United States had established that no condition or combinations of conditions would reasonably assure the safety of any other person and the community, should the Defendant be released. On October 15, 2025, the Defendant filed his Motion to Revoke the Magistrate's Detention Order [ECF No. 11], to which the United States now responds. A status hearing is scheduled for October 20, 2025.

B. *Factual Background*

As noted above, the Defendant is currently charged with two counts of Distribution of a Detectable Amount of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and four counts of Distribution of Forty Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi). The charges stem from his distribution of fentanyl to an undercover officer ("UC") on six occasions between April and August 2025. During each of the last four transactions, the Defendant sold the UC over forty grams of fentanyl in exchange for $2800.

After the sixth controlled buy on August 13, 2025, when he sold the UC approximately 55 grams of fentanyl, and in the days leading up to his arrest on October 1, 2025, the Defendant continued his recorded discussions about fentanyl trafficking with the UC. Specifically, he agreed to sell the UC a half kilogram of fentanyl in exchange for $17,500 during a transaction scheduled to take place on October 1, 2025. On the morning of October 1, 2025, before the controlled purchase was set to occur, law enforcement arrested the Defendant at his residence in Upper Marlboro, Maryland.

As noted above, the Defendant was indicted on September 30, 2025, and an arrest warrant was issued. On October 1, 2025, the Defendant was arrested at his girlfriend's parents' residence, where they – along with the Defendant, his girlfriend, and his two small children, one aged approximately 6 years and the other approximately 8 months old – also resided, and a search warrant for the residence was executed.   After law enforcement entered the residence, the Defendant was seen coming up from the stairs leading to the basement, where his bedroom was located. As further discussed below, law enforcement recovered, among other items, five different suspected controlled substances (fentanyl, cocaine base, cocaine, promethazine, and marijuana), approximately $10,000 in cash, hundreds of rounds of ammunition, and three magazines (including a drum magazine containing forty rounds) from the Defendant's bedroom and attached bathroom. Some of the suspected narcotics were recovered from the bathroom toilet, where the Defendant – who had a white powdery substance on his leg when he was arrested – apparently attempted to flush the cocaine base before it could be recovered by law enforcement.

## **ARGUMENT**

Pursuant to 18 U.S.C. § 3142(e)(3)(A), the Defendant faces a rebuttable presumption that no conditions or combinations of conditions can effectively ensure his appearance in this case and otherwise protect the community. The United States must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988)). In considering whether there are conditions of release which will reasonably assure the safety of any other person and the community, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Even assuming, *arguendo*, that the Defendant can rebut the presumption in favor of detention, the United States submits that based on a review of these factors, no condition or combination of conditions will ensure the safety of the community. Therefore, the United States respectfully requests that the Defendant's Motion [ECF No. 11] be denied.

I.    **Nature and Circumstances of the Offenses Charged**

The United States respectfully submits that the nature and circumstances of the charged offense weigh strongly in favor of detention. The Defendant distributed significant quantities of fentanyl, and was prepared to distribute even more, during a course of conduct that lasted approximately five months. Moreover, the Defendant did so despite his apparent awareness that law enforcement was surveilling him and had previously targeted some of his associates.

As this Court is aware, it is common knowledge that fentanyl is one of the most deadly substances illegally sold in our community.  According to the DEA, "fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage."[2]  Moreover, as the United States previously noted, final laboratory analysis indicates that the purity of the fentanyl sold by the Defendant was between 10 and 12 percent.  Indeed, in determining that detention was appropriate, Judge Faruqui indicated that this was one of the most serious cases he had recently seen.  *See* Detention H'rg Tr., *United States v. Crawford*, No. 25-cr-305, (D.D.C. Oct. 7, 2025), at 16:23-25.  As Judge Faruqui also said, "…if you were in front of any other judge, I would tell you this, it would not be a close decision." *Id.*, at 20:9-10.

Moreover, the specific circumstances of the Defendant's drug trafficking indicate that he is no low-level street dealer; on the contrary, he is a savvy, sophisticated, and well-connected drug trafficker.  The Defendant not only utilized multiple phones but also changed his phone number at least once during the investigation, a trick of the trade used by drug dealers with the experience, knowledge, and means to evade detection by law enforcement.  During just the six occasions on which he met with the UC in this case, he was accompanied by one of three different associates[3] and used two different vehicles (neither vehicle registered or otherwise linked to him) for

---

[2] https://www.dea.gov/resources/facts-about-fentanyl

[3]  None of these individuals are presently charged.

transportation, making clear that he has access to both people and the resources necessary to successfully operate his drug business.

Nor can the Defendant's apparent access and willingness to traffic in even greater quantities of fentanyl be minimized. As noted above, the Defendant agreed to sell the UC a half kilogram of fentanyl on a single occasion and was preparing to do so right before his arrest. The Defendant's own statements to the UC make clear that he has both the means and the willingness to source significant quantities of fentanyl on very short notice. Notwithstanding the fact that law enforcement arrested the Defendant before the scheduled controlled purchase occurred, the search warrant executed at his residence further demonstrates that his sales to the UC were not isolated, aberrant conduct – indeed, the evidence recovered from his residence sheds significant light on the nature and potential scale of his drug trafficking activities.

As noted above, inside the Defendant's bedroom and attached bathroom, law enforcement recovered significant quantities and multiple types of suspected controlled substances, along with indicia of narcotics trafficking. From the bathroom alone, law enforcement recovered approximately 52 grams of suspected cocaine base from the toilet bowl and wet packaging materials containing approximately 32 grams of suspected cocaine powder from the bathroom garbage can, as seen in Figure A below.



*Figure A: suspected narcotics recovered from Defendant's bathroom*

Based on the surrounding circumstances, including the Defendant's delayed response to law enforcement's entry and the presence of a white substance on his leg when he was arrested, it appears that the Defendant was actively attempting to destroy evidence by flushing the narcotics when law enforcement entered the home. Indeed, the Defendant was the last to respond to law enforcement's announced presence and verbal commands – coming up from the basement only after all the other adult occupants had responded. After the Defendant came upstairs, law enforcement went down to the basement, where they located the Defendant's bedroom and bathroom. In the basement, they also discovered the Defendant's two minor children – one approximately 6 years old and the other approximately 8 months old.

In addition to the narcotics recovered from the Defendant's bathroom, law enforcement also recovered multiple types of suspected narcotics and packaging materials, along with ammunition and magazines, from the Defendant's bedroom. Inside a dresser drawer, in which the

Defendant's driver's license was located, law enforcement recovered approximately 275 grams (with packaging) of a substance that tested presumptively positive for fentanyl and cocaine, as seen in Figure B below.



*Figure B: suspected fentanyl/cocaine recovered from Defendant's dresser*

As seen in Figure C below, on top of and inside that same dresser, law enforcement also recovered additional evidence of narcotics trafficking, including a white pyrex measuring cup and digital scale (both with white residue), along with drug packaging materials and approximately a half pound of marijuana.



*Figure C: indicia of narcotics trafficking and marijuana recovered from dresser*

In that same dresser, law enforcement also recovered Mannitol, a cutting agent commonly used to prepare drugs for distribution, and bottles of Promethazine, a prescription drug frequently used to make "lean" or "purple drank," an illegal – and dangerous – recreational drug, as seen in Figure D below.



*Figure D: Mannitol (l); Promethazine (r)*

9

Along with the controlled substances, cutting agent, packaging materials, and scale, law enforcement also recovered approximately $10,000 in cash, as seen in Figure E below.



*Figure E: US currency recovered from Defendant's bedroom*

In addition to the evidence of the Defendant's involvement with the distribution of multiple types of drugs, law enforcement also recovered hundreds of rounds of ammunition of assorted calibers and three magazines from his bedroom, including a drum magazine loaded with forty rounds, as seen in Figure F below.



*Figure E: drum magazine and ammunition recovered from Defendant's bedroom*

In sum, despite being aware that law enforcement were on to him, the Defendant has been charged as the result of his distribution of significant quantities of a highly dangerous drug, and the surrounding circumstances make clear that he had the ability – and willingness – to distribute even greater quantities, given his pattern of escalating conduct over a short period of time. His involvement in large-scale drug trafficking is further borne out by the evidence recovered from his residence: large quantities of five different types of controlled substances, various tools of the drug trade, and a significant sum of cash. Even setting aside the evidence indicating he is responsible for substantially higher quantities of narcotics than currently charged, the Defendant currently stands charged with narcotics offenses that subject him to a mandatory minimum of five years of imprisonment and up to forty, if convicted. As a result, the United States submits that the nature and circumstances of the charged offenses weigh in favor of detention.

## II.    Weight of the Evidence Against the Defendant

As the Defendant acknowledges, the weight of the evidence also supports detention in this matter. First, as noted above, the Defendant sold fentanyl directly to a UC on six separate occasions. Each of these transactions were audio and video recorded. In addition to these recordings, the supporting evidence includes text messages and recorded telephone calls between the Defendant and the UC regarding the controlled purchases, as well as the laboratory analysis of the substances purchased. As Judge Faruqui noted, "…I have to look at the weight of the evidence and it's strong." *Id*., at 26:17-18.

As also noted above, the recovery of suspected fentanyl and other narcotics, approximately $10,000 in cash, and drug packaging materials – all from the Defendant's bedroom – further corroborate his involvement in the drug trade. Moreover, the Defendant's own post-*Miranda*

statements weigh against him, given his suggestion that he was aware of law enforcement actions taken against some of his associates and that he might be under surveillance, and yet wondered why action had not yet been taken with respect to him.  Lastly, and as discussed during the continued detention hearing on October 7, 2025, law enforcement's preliminary review of the Defendant's cell phone communications has already uncovered additional evidence of his involvement in drug trafficking.  In sum, the weight of the evidence – including recorded controlled purchases, surveillance, recoveries of physical evidence, digital evidence, and the Defendant's own statements – weighs in favor of detention.

### III.    Defendant's History and Characteristics

It is undisputed that the Defendant has substantial connections to the area, including a supportive family.  Notwithstanding his familial support, however, the United States respectfully submits that his history and characteristics, viewed in their totality, also weigh in favor of detention.  Despite the Defendant's assertion that he lacks any prior criminal history [ECF No. 11-1, at 4], the Pretrial Services Report [ECF No. 6] shows five prior arrests and four prior criminal convictions.  Nor do the convictions identified on the Pretrial Services Report tell the full story of the Defendant's past criminal conduct.

His first conviction, in D.C. Superior Court Case Number 2013 CF2 3228, was for a firearms offense (Carrying a Pistol without a License).  At the time of his arrest at the age of 20, in addition to carrying a loaded Springfield Armory .45 caliber firearm, the Defendant was also carrying a bag of marijuana and $260 in cash.  Although he received the benefit of a Youth Act sentence and had the conviction successfully set-aside, it cannot be overlooked that he went on to commit *three* additional crimes before the firearms case was resolved in 2017.

First, just over a month after his arrest with the gun and marijuana, he was again arrested after being found in possession of 42 grams of marijuana. Although he was initially charged with Possession with Intent to Distribute Marijuana, he was allowed to plead to misdemeanor marijuana possession and received the benefit of probation before judgment in Charles County District Court Case Number 5P00085132, which was later pardoned. Less than two weeks after his arrest in that case (and while both that case and his firearms case were still pending), he was arrested again, ultimately pleading guilty to misdemeanor marijuana possession and receiving a sentence of two days in Charles County District Court Case Number 2P00085339.

Despite having been arrested multiple times in a short period of time and receiving the benefit of lenient plea offers and sentences, the Defendant was arrested once more on January 28, 2014. He again received the benefit of a lenient plea offer and sentence, ultimately pleading guilty to misdemeanor marijuana possession in Charles County District Court Case Number 4P00089310 (which was also later pardoned by the governor) and receiving only a six-month suspended sentence. Notwithstanding the leniency of the plea offer and sentence, the underlying circumstances of his arrest (and the related traffic case) are incredibly concerning.

Specifically, a review of the underlying police reports and court documents indicates that, after law enforcement attempted to conduct a traffic stop of the Defendant, he fled at a high rate of speed through a neighborhood and school parking lot before losing control of the vehicle. When law enforcement attempted to block the vehicle in, he drove over a median and collided with a police car. He then continued to flee by speeding up, turning off his headlights, and driving on the wrong side of the road. Law enforcement was ultimately forced to disable the vehicle's tires to bring the Defendant to a halt; even then, the Defendant attempted to flee on foot before being

apprehended, where he was found in possession of approximately two ounces of marijuana. Although this case was ultimately resolved by way of another misdemeanor guilty plea to marijuana possession, with the Defendant receiving only a suspended sentence, and a related traffic case and imposition of a fine, that was not the end of the Defendant's criminal activity.

His most recent criminal conviction occurred in 2022, in St. Mary's County District Court Case Number 18CR22-000226, following his October 2021 arrest for prescription fraud. Although he received the benefit of another lenient plea offer (again to a misdemeanor charge), the underlying circumstances make clear that he was part of a prescription fraud ring that involved at least four defendants charged with obtaining prescription medicine by deception. Even more troubling, the supporting reports make clear that his own mother's name was one of those used by the Defendant and his accomplices in that case to fraudulently obtain prescription medication, including Promethazine – the same substance found in the Defendant's bedroom on October 1, 2025.

As the Defendant's Motion notes and the United States recognizes, he has substantial connections to the area, including his family, with whom he now seeks to reside if released. As discussed during the detention hearing, however, he was residing with his parents *at that same address* during almost all his prior arrests and convictions, including his 2013 firearms conviction (which also involved circumstances indicative of drug trafficking). As Judge Faruqui also noted, the fact that the Defendant did all of this while living in his parents' residence raises concerns. *See id.*, at 18:1-10. Given that he is even older now – indeed, he is now a grown man with two children who has not resided with his parents for ten years and has been unemployed for five years, according to his father – and that his criminal conduct has only escalated, it is difficult to fathom

how his family would have more influence over his conduct now than they did a decade ago. Nor can the Court overlook the fact that, at the time of his arrest, he appeared to be running his drug operation out of *his girlfriend's parents' house* – where they, along with his two small children, all resided. Put simply, nothing about the Defendant's history and characteristics indicate that he is likely to be deterred from continuing to engage in drug trafficking, regardless of where, or with whom, he resides.

Even more troubling is the recently uncovered evidence that the Defendant may have involved one of his own brothers – who resides at the same residence with his parents – in his drug trafficking business. As Judge Faruqui said, "I am really concerned now that your brother has some exposure and that, you know, him serving as one of your custodians because one of the proposals had him." Detention H'rg Tr., *United States v. Crawford*, No. 25-cr-305, (D.D.C. Oct. 7, 2025), at 22:3-6. To be clear, the United States is not alleging here that the Defendant's brother was one of his co-conspirators. Because the Defendant's request for release, however, is largely premised upon his assertion that any danger he poses to the community can be mitigated by allowing him to reside with and be supervised by his family, any evidence indicating that his brother may be involved in his drug trafficking cannot be overlooked.

As noted during the detention hearing, a preliminary review of the Defendant's cellphone revealed, among other things, an April 2024 text message between the Defendant and a contact saved in his phone as "Cam" with a phone number linked to the Defendant's brother through law enforcement databases and credit reporting sources. In this text exchange, "Cam" sent the Defendant a picture showing a bottle containing a substance consistent in appearance with Promethazine, the same substance involved in the Defendant's prior prescription fraud case and

recovered from his residence during the execution of the search warrant in this case. Communications with "Cam" appear to cease around the same time that the Defendant begins communicating with another phone number ending in 6202, currently believed to be used by that same brother. (Of note, the Defendant's father is listed as the subscriber for the phone number and the family's residence is the address of record on the account.)

In some of the messages sent this year between May and September 2025, the Defendant and his brother appear to be discussing narcotics. For example, on May 24, 2025, his brother texts the Defendant, "They said blow had five bars and 4 pinks on him lls" – terms consistent with a reference to Xanax bars and pink Oxycodone pills. (Of note, approximately four pink suspected Oxycodone pills were also recovered from the Defendant's bedroom during the execution of the search warrant on October 1, 2025.) In other text messages, the Defendant and his brother appear to be discussing weights and prices, as well as one of the Defendant's suspected co-conspirators, as seen in Figures F – H below.



*Figure F: July 20, 2025 texts between Defendant (l) and his brother (r)*



*Figure G: July 21, 2025 texts between Defendant (l) and his brother (r)*



*Figure H: September 10, 2025 texts between Defendant (l) and his brother (r)*

As discussed during the detention hearing, "Freaky" has now been identified by law enforcement and is believed to be one of the Defendant's co-conspirators.

As also noted during the detention hearing, although no firearms were recovered from the Defendant's residence, the preliminary review of his cellphone also provides significant insight into his involvement with firearms. Specifically, during a series of text messages exchanged

between the Defendant and another individual, identified in the Defendant's phone as "Jaylen," the two appear to discuss the modification of firearms to render them fully automatic. On June 5, 2025, Jaylen texts the Defendant, "Arp test functional 100$" and sends an image of what appears to be a conversion kit designed to render a firearm fully automatic. Jaylen also sends the Defendant a video that appears to show a fully automatic firearm being discharged. As seen in Figure I below, the video includes text that appears to describe modifications to a 7.62 AR-15, a type of assault rifle.



*Figure I: June 5, 2025 screenshot of video sent to Defendant*

After Jaylen tells the Defendant to "spread word," the Defendant says "Got u ima bring my joint when I slide thru later n see what you can do to my joint." In subsequent text messages sent later in June, Jaylen discusses having "…a couple 3D print orders…." The Defendant asks, "Can u put them situations on g20 gen 5 if so my Ppls tryna get 1." Jaylen then responds by saying, "Only Gen 3. Got sum else for that" and later with "Gen 1-3." As stated on the record during the detention hearing, these communications appear to be referring to modifications available for Glock 20 firearms.

In addition to the evidence regarding the Defendant's involvement with drug trafficking and firearms, his post-*Miranda* statements following his arrest also raise significant concerns. As noted above, the Defendant suggested to law enforcement that he was aware that law enforcement had been surveilling him and that some of his associates had already been targeted; notwithstanding this knowledge, however, he not only persisted in his own criminal conduct but escalated his behavior – agreeing to sell *a half kilogram* of fentanyl at one time. In short, the Defendant's willingness to not only continue to sell drugs but to do so in increasingly greater quantities, notwithstanding warning signs of law enforcement's investigation, is incredibly troubling.

## IV.    The Nature and Seriousness of the Danger poses by the Defendant's Release

In sum, the nature and seriousness of the danger posed by the Defendant cannot be overstated, nor can it be appropriately mitigated by conditions of release. To be clear, there is danger to the community inherently posed by any narcotics trafficker, as reflected in the rebuttable presumption at issue. But the risk is compounded where, as here, the drug at issue is fentanyl, a highly dangerous controlled substance, particularly where the Defendant is alleged to have been involved with significant quantities of that drug and appears to have been working with multiple individuals who have not yet been apprehended.

As evidenced by the investigation, he appears to have multiple connections he can rely on to facilitate his drug business, whether to act as a source of supply or to provide transportation to a sale. The Defendant chose greed and selling illegal substances over obtaining lawful employment to support his family, including his young children. Notwithstanding the clear support of his family, he was undeterred from committing criminal conduct while living with his parents in the past and may have even involved his own younger brother in his recent drug

19

trafficking.  Moreover, he appears to have been operating his current drug business from his girlfriend's parents' residence, where his young children also resided.  He was undeterred by even the threat of potential law enforcement action, given his continued and escalating criminal conduct after learning that his associates had been targeted by law enforcement and that he might soon be as well.

Nor can the Defendant's involvement with firearms be overlooked, given the large quantities of ammunition of varying calibers and three magazines, including a drum magazine loaded with forty rounds of ammunition, recovered from his bedroom on October 1, 2025.  To be clear, no firearm was recovered from the Defendant's residence at that time.  The recovery of the ammunition and magazines, however, coupled with the Defendant's own recent communications regarding firearms, including a request regarding his own "joint," make clear that the Defendant has recently been in possession of at least one firearm.  As this Court is aware, possessing firearms during or in connection with drug trafficking offenses poses increased danger given the extent to which drug trafficking can trigger violence.

Put simply, the Defendant is a drug trafficker with both the will and means to sell multiple types of narcotics, including significant quantities of fentanyl.  Additionally, evidence indicates that he has recently been in possession of one or more firearms, and a drum magazine containing forty rounds of ammunition was recovered from his residence at the time of his arrest.  He was undeterred from engaging in criminal conduct when he previously resided with the family he wishes to reside with, and he was undeterred from drug trafficking when recently living with his children, his girlfriend, and her parents.  Nor does it appear that even the prospect of law

enforcement action was sufficient to curb his drug trafficking.  As a result, the danger he presents to the community cannot be understated.

## **CONCLUSION**

Based on the foregoing, and any other reasons that may be detailed at a hearing on the motion, the United States respectfully requests that this Court deny Defendant's Motion.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/*_____
ANTHONY SCARPELLI
D.C. Bar No.  474711
ANDREA DUVALL
AR Bar No. 2013114
Assistant United States Attorneys
D.C. Bar No.  1029325
601 D Street, N.W.
Washington, D.C. 20530
202-252-7707 (Scarpelli)
202-252-2408 (Duvall)
anthony.scarpelli@usdoj.gov
andrea.duvall@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2024, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

_/s/_____
ANDREA DUVALL
Assistant United States Attorney